UNITED STATES, Appellee

v

SHERMAN D. STEWARD, Private E–2, U. S. Army, Appellant

6 USCMA 531, 20 CMR 247

No. 6792

Decided December 9, 1955

*Captain Albert C. Malone, Jr.*, argued the cause for Appellant, Accused. With him on the brief were *Lieutenant Colonel Jackson K. Judy* and *First Lieutenant Leslie D. Scharf.*

*First Lieutenant Robert L. Taylor* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Lewis W. Evans.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

### I

A general court-martial convicted the accused of larceny of clothing, in violation of the Uniform Code of Military Justice, Article 121, 50 USC § 715. He was sentenced to dishonorable discharge, total forfeitures, and confinement for three years and six months, and intermediate reviewing authorities have affirmed the findings and sentence.

We granted his petition for review to pass on the single issue of whether the evidence is sufficient to establish a value which will support the sentence.

### II

On September 11, 1954, Private Pienta was granted emergency leave from Camp Kilmer, New Jersey. He placed his clothes in a duffel bag, which a friend was to store in the supply room. Upon his return on September

29, 1954, he learned that the bag had not been turned in and that a "statement of charges" had been prepared against him. On November 8, 1954, he arrived at Fort Kobbe, Canal Zone, where accused was also stationed, and—as a result of leads obtained at that time—he examined accused's wall locker and there found several of the missing items. He reported this discovery to the commanding officer and the resulting search uncovered additional items of his missing clothing.

The Government relied on an expert witness from the Quartermaster Corps to establish the value of the stolen property. This witness classified eight items in their then soiled condition as being worth no less than forty percent of their initial value, as fixed by Department of the Army Special Regulation 32–20–2 (Price List), June 16, 1954. However, he was of the opinion that the items would be worth seventy-five percent of their original value if laundered. Those are the only items in dispute and if their value is computed on the seventy-five percent basis, the total value for the eighteen items of clothing stolen amounts to $58.49. That value will support the present sentence. However, if we assess forty percent of the initial value of the eight disputed items, as contended for by the defense, then the value of the stolen clothing is less than the required $50.00.

An essential element of pleading and proof in the offense of larceny is that the property described in the specification be of the value alleged or of some value. United States v Peterson, 2 USCMA 645, 10 CMR 143; United States v May, 3 USCMA 703, 14 CMR 121. That requirement has been met here, but the period of confinement which may be imposed is graduated in direct proportion to the value proven, and, in this instance, a value of even one cent less than $50.00 makes considerable difference to the accused.

### III

In assailing the findings in this case, appellant contends we should disapprove the use of Government pricing lists in determining the value of clothing. To support his contention for disapproval, appellant argues that clothing is personal property, that title is not in the Government, and that official price lists do not fix properly the actual value. He states that the articles stolen have a readily ascertainable market value as they are available for purchase on the open market, and the criteria by which these prices are fixed by the Government inflate the true worth of the merchandise.

On the other hand, the prosecution insists that the items taken were Government property and, therefore, value may properly be determined by the method herein used. This insistence is founded upon the provisions in the Manual for Courts-Martial, United States, 1951, paragraph 200a, page 361, which provides as follows:

"Items of government issue which were serviceable government property at the time they were stolen are deemed to have values equivalent to the prices therefor as listed in official publications or, if not so listed, as otherwise officially recognized. As a general rule, the value of other stolen property is to be determined by its legitimate market value at the time and place of the theft."

While the foregoing provision refers to Government property, we hold that in this instance it is immaterial where title rests as enlisted men's clothing is for all practical purposes akin to items of Government issue. The soldier cannot freely dispose of his clothing because he must wear his articles of military dress in the course of his duty. Paragraphs 4b and 5d (1), SR 32–20–1, January 18, 1954. Likewise should his service be less than six months, he is not permitted to keep all the items issued to him. Paragraph 23a and c, SR 32–20–1, as changed by C1, September 10, 1954. Certain items of clothing are not generally available on the open market, and because the wearing of serviceable military clothing is confined largely to service personnel and over-the-counter trading is limited, the use of an official publication establishing sale prices should be the best meth-

**533**

od of proving its value. Assuming for the moment we were to attempt to determine the market value solely from merchandising outlets, our best source of information would be the Army Quartermaster Stores, which can be considered to represent a legitimate market for clothing by reason of their large volume of sales of both new and used apparel. The prices in these stores are governed by the price lists introduced in this case. Thus, in a real sense, the Government lists set forth the market price for military clothing, and we are not disposed to overturn a practice and procedure which has been used in the military for many years.

## IV

Appellant principally contends that, even when using the Government sale figures, the total value of the property stolen was no greater than $49.22. This reduced amount is arrived at by assessing forty percent of initial value to the eight pieces of wearing apparel identified as Prosecution Exhibits 1, 2, 4, 11, 12, 13, 16, and 17, and by giving no value to Prosecution Exhibit 3.

As mentioned earlier, the Government used an expert witness from the Army Quartermaster to establish the value of each article. He was familiar with the classification of clothing and military equipment as prescribed by pertinent regulations. He testified as to the procedure and classification used in the Caribbean Command, stating that in determining the value of clothing, four categories were utilized. Class A designated a new item which had not been worn. Included in Class B are items which are combat serviceable, have retained at least seventy-five percent of their initial worth, and do not need to be repaired, laundered, or cleaned. Class C embraces repairable items which are worth at least forty percent of their initial value. Class D is salvage, having less than forty percent of its initial worth. After setting up the various categories, the expert then testified in detail regarding Prosecution Exhibits 1 through 18, placing each in one of the four categories. He classified the eight articles in dispute as being in Class C because of their soiled condition, having no less than forty percent of their initial value. Exhibit 3, he said, was fit only for salvage or D classification. However, the witness admitted that with laundering and the markings obliterated, the items catalogued in Class C would be worth seventy-five percent of initial value. Because the cost of laundering would be small in comparison to the increase in value that would result, the Government argues that seventy-five percent of initial worth is the true measure of the value of those items of loot. The difficulty with the argument stems from the fact that the witness stated positively that in the condition he observed them, the items must be placed in the forty percent class. Assuming that by laundering the value could be increased, we have been unable to find a laundry price list in the record, and we have no way of legally ascertaining what it would cost to launder the eight pieces and obliterate the markings. The cost of such a service would be a deduction from the value of the clothing if placed in Category B, and while it is entirely possible that if we were to consider them in that class, the cost of cleaning and rehabilitating would not reduce the value below $50.00, we cannot so determine without going outside the record. The burden is on the Government to establish value, and all it has done is to show that if money in an unknown amount was expended, the value would be enhanced and the clothing would be considered in a better class. However, as seen by the witness and without the expenditures, the goods were placed in a class which fixed their worth at less than the required $50.00. The court-martial on the evidence could legally do no more.

It is suggested by the Government that the clothing could have been in a laundered state when stolen, but the suggestion is, at best, speculative. Certainly it finds no support in the record. Value is determined at the time of the taking, and the burden is on the prosecution to show the condition of the property at that time. Rather than showing that the clothing was in a

clean condition, the record preponderates in favor of a finding that the particular pieces were not. A fair inference is that the cotton clothing would have been in constant use during early September. This, coupled with Private Pienta's hasty departure on emergency leave, would indicate he was forced to store the items unlaundered. The inference is strengthened by the fact that only the woolen items of clothing were placed in the A classification, so the victim could not have been wearing those prior to leaving. Furthermore, there is no showing that wear by the accused depreciated the value of the articles. Therefore, to hold him responsible under those circumstances would be substituting speculation for proof.

Aside from the failure of the prosecution to show the condition of the property when stolen, the ▬▬▬ ▬ method of proving value in this case leaves much to be desired. The expert testified to the classification of each of the exhibits, but he was not called upon to establish where within the category the item fell. That fact is of some importance. The range in Class C spread from forty percent of value to seventy-five percent of value, the cost of laundering or repairs notwithstanding. There is a likelihood that some of the items were worth more than the minimum price of the class, but if so, the evidence to that effect is not in the record. It would have been an easy matter to have fixed the precise value of each item, rather than force appellate courts to grope in the dark as to the amount in issue. Here, the failure to establish where within the classification the items fell, or to show other necessary factors, leaves us no alternative but to use the lowest price for each of the disputed items.

We must value the eight items, as did the expert, and place them in Class C at forty percent of value. The one item identified as Prosecution Exhibit 3 was placed in Class D without value, and this testimony must be accepted. When we interpret his testimony in that light, we are forced to reach the conclusion that the stolen clothing was worth slightly less than $50.00. It follows that the Government has failed to establish a value which will support more than one year in confinement, and the court members acted on something other than substantial evidence in finding such a value.

We return the record to the board of review for reassessment of the sentence in accordance with this opinion.

Chief Judge QUINN and Judge BROSMAN concur.