UNITED STATES, Appellee

v

BILLY LEAL, Jr., Airman Second Class, U. S. Air Force, Appellant

7 USCMA 15, 21 CMR 141

No. 7582

Decided April 20, 1956

*Captain George M. Wilson* argued the cause for Appellant, Accused. With him on the brief was *Lieutenant Colonel Stanley S. Butt.*

*Lieutenant Colonel Roger H. Miller* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Emanuel Lewis* and *Major Norman A. Faulkner.*

## Opinion of the Court

GEORGE W. LATIMER, Judge:

Following trial by general court-martial, the accused was found guilty of four offenses of larceny, in violation of Article 121, Uniform Code of Military Justice, 50 USC § 715. He was sentenced to dishonorable discharge, total forfeitures, and confinement for two years. Intermediate reviewing authorities have affirmed, but The Judge Advocate General of the Air Force suspended execution of the punitive discharge. We granted review to determine:

1. Whether the evidence is sufficient to corroborate the accused's pretrial statement.

2. Whether the evidence is sufficient to establish the value alleged and found.

In order to better understand the facts as they relate to the specifications, we believe it will be of assistance to set out the particular offenses alleged. Specification 1 charges the theft of seventy type 6SN7GT tubes of the value of $24.50; specification 2 alleges the taking of ninety type 6AG5 tubes of the value of $55.80; specification 3 sets out the larceny of thirty-three type 6SN7GT tubes of the value of $11.00; and specification 4 pleads the theft of miscellaneous signal equipment of the value of $22.07.

A short resume of the facts applicable to all specifications follows. At

all times pertinent to the specifications, the accused was a navigation equipment repairman, assigned to a unit engaged in the inspection and maintenance of communications equipment. As such, he had ready access to electron tubes and related equipment. When electronic sets which required special treatment, such as moisture proofing, were received by his unit, it was a matter of operating procedure to repair them, remove the tubes, store them in bins or boxes in the workshop, and send the sets to a nearby work unit for special processing. When they were returned, the tubes were replaced and the sets tested to insure that they were operating satisfactorily. They would then be returned to a supply issue warehouse. The tubes were not inventoried when the equipment was received, but the unit supervisors had learned, as a matter of experience, that normally less than five percent of the sets were received with any tubes missing. Reframing their statements, it would appear that least ninety-five percent of the sets, when received, had all tubes in place, but from five to ten percent of the tubes would turn out to be defective and require replacement. Unserviceable tubes were kept in a trash barrel outside the workshop, and most of them were broken when they were discarded. All of the tubes and related equipment were the property of the United States, and no one was authorized to possess them for personal use. Personnel employed in the repair shop were not "checked" when they left the premises at the end of the working day.

On March 4, the accused was taken into custody, searched, and interrogated. In a pretrial statement, the voluntary nature of which was not contested at trial, he admitted that on March 1, 1955, he had stolen seventy 6SN7 tubes from his section; on March 2, 1955, ninety 6AG5 tubes; on March 3, thirty-three 6SN7 tubes; and on or about March 4, twenty more tubes and three crystal units. All of the tubes were sold on the Japanese market for cash, except the last group, which was found on his person and among his personal effects, and they were the property of the United States. In his written confession, the accused asserted that he had obtained the tubes "from the trash can where old tubes are thrown," and that only about one-fourth were in working condition.

On March 7, 1955, Lieutenant Henry R. Lytle, the officer in charge of the repair facility, conducted an inventory to determine the number of tubes on hand. Because no accurate record was kept of the quantity of good tubes received with the sets or the number of worthless tubes discarded, exactness in the inventory was impossible. However, mathematical precision is not required to support a corpus delicti, and so we need only ascertain whether the evidence disclosed a probability that a shortage, not occurring in the regular course of business, existed. In connection with the second specification, which we prefer to deal with first, we have the following facts to rely upon. The officer, by an acceptable method, determined that the unit had on hand some sixty-four sets of a type designated as R-15/APN-3. Each set was normally equipped with seven electron tubes of a type known as 6AG5. It was assumed, for the purpose of the inventory, that nine sets were received without tubes and that five tubes had been destroyed. Thus, there should have been on hand some 380 tubes of the 6AG5 type, for these sets. In addition, fifteen new ones of the same kind had been received from supply sources, making a total of 395 tubes for which the unit was accountable. Only 287 could be found, leaving a net shortage of 108. Each 6AG5 tube, if serviceable, was worth sixty-two cents.

To establish the corpus delicti required for the first and third specifications, Lieutenant Lytle testified that 26 type ID-17 receivers were charged to the repair unit. Each receiver normally contained twelve 6SN7GT electron tubes. These sets had been "hot checked" when they were received, and found to be in operating condition. Thus, the unit should have had 312 tubes of this class in its possession. Instead, there were

only 174, resulting in a shortage of 138 of this particular type. Each tube, if serviceable, was worth thirty-five cents.

On March 4, 1955, the accused was seen talking to Japanese nationals in Tachikawa Shi, Japan, by three agents of the Office of Special Investigations. They accosted the accused and eventually obtained his consent to a search of his person, the reasonableness of which he did not contest at trial. Two electron tubes, type JRC9004, and three crystal units, type 1N21, were found on his person. The following day, the accused's personal effects were searched, with the consent of his squadron commander. Eighteen electron tubes, type 6L6, were found. Witnesses for the Government, who normally served as repairmen in the accused's sub-unit, were unable to identify the 9004 tubes as of a type currently in use by them. The other types were used by them in daily operations. However, 9004 tubes are currently used in the Air Force, the repair unit as a whole consisted of other sub-units as well as the accused's, and we are sure it is likely that 9004 electron tubes, if used anywhere, would be likely to be found among the items on hand in a unit devoted exclusively to the repair and maintenance of electronic communications equipment. Thus, it is fair to say that all of these items were available at the repair shop where the accused was assigned for duty. It was shown that 6L6 tubes, if serviceable, are worth fifty-four cents each; serviceable crystal units are worth $3.25 each; and JRC9004 tubes in the same condition are worth $1.30 each. The theft of these items is alleged in specification 4.

## II

In many earlier cases, we have given exhaustive consideration to the principle which requires the showing of a corpus delicti. In those instances, we have established, as a guiding principle, that the prosecution must present some evidence of wrongdoing, apart from the confession, touching each element of the offense, save the identity of the perpetrator, to establish the corpus delicti of the offense. United States v Isenberg, 2 USCMA 349, 8 CMR 149; United States v Petty, 3 USCMA 87, 11 CMR 87; United States v Villasenor, 6 USCMA 3, 19 CMR 129. In the case of larceny, this evidence usually takes the form of testimony that property of a given value is missing, under circumstances indicating that it was probably stolen. United States v Evans, 1 USCMA 207, 2 CMR 113. However, the evidence of a shortage may be shown by circumstantial evidence. United States v Chaput, 2 USCMA 127, 7 CMR 3; United States v Evans, supra. With these principles in hand, let us summarize the evidence before us to determine whether it meets the minimum standards required by our previous decisions. As a matter of convenience, the evidence on the four specifications will be marshaled into three groups.

Specifications 1 and 3 allege the theft of electron tubes, type 6SN7GT, on March 1 and 3, 1955, respectively. It was shown that the unit workshop was charged with some twenty-six ID-17 receivers, each of which normally contained twelve 6SN7GT tubes. The sets had all been in operating condition when they were received, and they had been checked by Sergeant Skellen and the accused. A physical count disclosed that 138 tubes of this type were missing. While the accuracy of the inventory may be questioned, when all doubts are resolved in favor of the accused, there remains evidence of a substantial shortage. This, we are sure, was sufficient evidence to permit consideration of the accused's confession as to these two offenses. True enough, the particular items might have been lost, or misplaced, or even accidentally discarded. But those possibilities are speculative and not likely explanations for the disappearance of some forty-four percent of the tubes on hand of that type. It does not furnish a satisfactory answer to theorize, as does appellate defense counsel, that these tubes might have been discarded because they were of no value and later taken by the accused from the trash

**19**

barrel, for the sets were in operating condition when they were received, and the tubes were sufficiently usable to bring a price on the black market. It should be mentioned in passing that it is immaterial whether the testimony, outside of the confession, reveals whether there was only one loss, or a number of them. It is sufficient that the evidence, taken as a whole, reveals the number of separate thefts alleged. United States v Stribling, 5 USCMA 531, 18 CMR 155.

Specification 2 of the Charge alleged the theft of 90 electron tubes, type 6AG5, on March 2, 1955. ▮▮▮▮▮ As a result of the inventory, and taking into account certain adjustments to the inventory figure made necessary by the method of operation, it was determined that the unit involved was short 108 tubes of this type. Although the sets were not checked when they were received for the presence of all their tubes, experience within the unit had established that not more than five percent of the tubes would be missing. When allowance is made for that factor, an unexplained shortage of at least 102 tubes existed. Again, the number of tubes missing is sufficiently great to render it improbable that the loss was accidental, or the result of discarding unusable tubes.

Specification 4 alleged the theft of the electronic equipment found in the possession of the accused ▮▮▮▮▮ at the time of his arrest. Here there was no independent proof of the extent of the shortage, but it was shown that the equipment was of the type and kind of Government property to be found within the unit workshop; that the accused had access to this equipment; that he had opportunity safely to remove it from the premises; that he was not authorized to possess the property; and that he had removed portions of it from the base. This is sufficient circumstantial evidence to establish the probability that Federal property had been surreptitiously stolen. When those facts and circumstances are joined with the evidence that the equipment was found among the accused's possessions and on his person under suspicious circumstances, it is apparent that the evidence is much more than enough to satisfy the corpus delicti requirement.

### III

At trial, the Government relied upon an Air Force Supply Catalog, an official publication setting forth ▮▮▮▮▮ the prices of serviceable Government equipment, to establish the value of the missing electronic equipment. This was proper — as we have already held, United States v Steward, 6 USCMA 531, 20 CMR 247 — but appellate defense counsel vigorously urge that the evidence is insufficient to show that any substantial part of the stolen property was in usable condition. With this argument we cannot agree.

There was evidence that the re-use of the missing tubes was contemplated, for experience had shown ▮▮▮▮▮ that at least ninety percent of the tubes would be operative. Although it was not shown that they had been tested, we are willing to favor the accused and assume that some of the missing tubes taken by him were defective. When allowance is made for the ten percent of the tubes which we assume were unserviceable, the value of the remainder is still more than enough to support the findings. There was no possible way in which the court-martial could find which tubes, of the group taken, were valueless. But it could find that at least ninety percent of the tubes were worth their catalog value to the Government as serviceable property. Although the court-martial could have believed that the accused spoke truthfully when he said, in his pretrial statement, that he had only taken tubes from the trash barrel, they were not obliged to do so. If they did not, then they were entitled to believe that the tubes which he took came from among the tubes on hand to be re-used. A strong factor indicating that the stolen tubes were not taken from the barrel of discards is the fact that the accused concedes he was successful in selling them night after night for a valuable consideration.

We note in passing that no allowance was made, either in the allegations or the findings, for the fact that no more than ninety percent of the electron tubes identified in specifications 1, 2, and 3, may be taken as having value. Consideration of this factor would vary slightly the total value of the property stolen. However, the value, as modified, remains sufficient to support the findings as to the grade of larceny involved.

Accordingly, the decision of the board of review is affirmed.

Chief Judge QUINN concurs.

Judge FERGUSON did not participate in the decision in this case.