UNITED STATES, Appellee .

v

DANIEL THORNTON, Specialist Third Class, U. S. Army, Appellant

8 USCMA 57, 23 CMR 281

No. 9119

Decided June 7, 1957

*First Lieutenant Arnold I. Melnick* argued the cause for Appellant, Accused. With him on the brief were *Colonel J. M. Pitzer* and *Captain John F. Christensen.*

*Captain Thomas J. Nichols* argued the cause for Appellee, United States. With him on the brief were *Lieutenant Colonel Thomas J. Newton* and *First Lieutenant Chester F. Relyea.*

### Opinion of the Court

HOMER FERGUSON, Judge:

Before a general court-martial, convened at Fort Benning, Georgia, the accused pleaded not guilty to unlawfully purchasing a pistol of a value of $53.00, knowing the same to be stolen, and guilty to carelessly discharging a firearm, both offenses being in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. For these delicts, he was found guilty as charged and sentenced to be dishonorably dis-

charged from the service, to forfeit all pay and allowances, and to be confined at hard labor for one year. The findings and sentence were approved by the convening authority and subsequently affirmed without opinion by a board of review. We granted review to determine the following issues:

1. Whether trial defense counsel could adequately represent the accused.

2. Whether the evidence is sufficient to support the finding of value in specification 1.

I

A recitation of the facts and circumstances which gave rise to the first granted issue is essential. On the evening of April 2, 1956, the accused purchased a .45 caliber pistol, the property of the United States, from one Fields. The sale was allegedly consummated after considerable haggling over the price which was finally established at $20.00. At trial, Fields testified on behalf of the prosecution that he had sold the pistol to the accused. He further testified that he had stolen the pistol some seven months before while on guard duty. On cross-examination, the defense counsel elicited from the witness the statement that he had not informed the accused that the pistol was stolen property until after the sale had been finalized. On redirect examination, the witness identified the defense counsel as the same attorney who had represented him in his prior court-martial conviction for stealing a pistol and for unlawfully selling it. The prosecution next called one Nelms who had been present when the alleged sale took place and though his testimony was in part contradictory, he claimed that the accused had been informed, prior to the consummation of the sale, that the pistol had been stolen. The accused did not take the stand in his own behalf.

The court-martial of the accused was held on June 14, 1956, and he was represented by a certified appointed defense counsel. Some six weeks prior to this trial, Fields had pleaded guilty before a general court-martial to the offenses of larceny of the pistol, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921, and unauthorized sale of the same to the accused in contravention of Article 108, Uniform Code of Military Justice, 10 USC § 908. Counsel for the accused in the instant case had also represented Fields. The accused now contends that as a result of this dual representation he was deprived of the effective assistance of counsel.

A case strikingly similar to the one presently before us and involving substantially the same issue was recently before this Court in United States v Lovett, 7 USCMA 704, 23 CMR 168. There we held it to be error for defense counsel to represent an accused who pleaded not guilty and an accused who pleaded guilty to the same offense, where the latter was a witness for the prosecution against the first accused. Our holding was no more than a reiteration of the well-settled principle that counsel must not represent conflicting interests. Although we recognized the fact that prior representation by defense counsel of a Government witness against the accused "does not by itself justify a conclusion that the accused was denied effective legal assistance," we held that the prior nature of the relationship in that case required reversal. We are constrained to reach a similar conclusion in this case.

In attempting to convince the court-martial of the accused's innocence, counsel was under an affirmative duty to protect and safeguard the confidences derived from the attorney-client relationship formerly established and still existing between himself and Fields. Counsel thus found himself placed in the legally precarious position of having to "walk the tightrope" between safeguarding the interests of the accused on the one hand and retaining the prior confidences of Fields on the other. Such a rope is too narrow. Such a walk is too long. The possibility of falling is too real. The probability of prejudicing the accused is too great. The basic underlying principle which condemns the representation by an at-

torney of conflicting interests seeks to achieve as its purpose no more than this—to keep counsel off the tightrope. The orderly administration of justice requires that an attorney not be placed in the position where he must choose between conflicting interests. Counsel for the accused was placed in that position in this case. The late Judge Brosman, writing for a unanimous Court in United States v McCluskey, 6 USCMA 545, 20 CMR 261, eloquently stated the principle in the following manner:

"It may be accepted as settled law in this Court that, since a lawyer is bound by professional duty to avoid divulgence of a client's confidences to the disadvantage of the latter, doubts concerning equivocal or apparently inconsistent conduct on the part of the attorney must be resolved against him—that is, it must be regarded as having been antagonistic to the best interests of his client. See In re Boone, 83 Fed 944, 952 (ND Cal). This rule stands as a rigid—perhaps even a dogmatic—one. We are sure that it exists of necessity, not only for the purpose of circumventing the dishonest practitioner's malfeasance, but also to prevent the upright lawyer from placing himself in such a position as to require him to choose between conflicting duties. People v Gerold, 265 Ill 488, 107 NE 165, 177, and authorities there cited. Thus, regardless of the purity of his motives, it is demanded that the lawyer avoid the very *appearance* of that wrongdoing which, in obedience to the important policy dictating this privileged relationship, the courts are impelled to deplore—for 'no rule in the ethics of the legal profession is better established nor more rigorously enforced than this one.' "

We are convinced that defense counsel acted in good faith, but this does not affect our holding because we believe that he nevertheless failed to realize the full implication of his prior association with Fields as it related to his duties to the accused. E.g., Tucker v United States, 235 F2d 238 (CA9th Cir) (1956); Craig v United States, 217 F2d 355 (CA6th Cir) (1954). Defense coun-

sel made no effort to examine his former client on the question of whether the accused had actually purchased the weapon from him. He never interrogated the witness on the fact of his theft of the pistol or whether it came from a Government source. Yet, it is well settled that it is not sufficient in a case of this kind to show merely that someone was convicted for the actual larceny. Kirby v United States, 174 US 47, 19 S Ct 574, 43 L ed 890. These defects in the examination can reasonably have resulted from defense counsel's previous connection with the witness. Since he had pleaded him guilty of stealing the pistol and subsequently selling it to the accused, defense counsel may well have taken these facts as established—to the patent disadvantage of his present client, the accused.

Moreover, the evidence relating to the accused's knowledge that the gun was stolen was weak. In his direct testimony the witness implied that he had told the accused before the sale that the weapon was an Army .45. On cross-examination, he said that he told the accused that it was a stolen gun only after the transaction had been completed. On redirect examination, trial counsel asked him one question: "Who defended you in your court-martial [for the larceny]?" The witness identified defense counsel as his lawyer. The question is so unusual that it has given us considerable pause. After much reflection, only two tactical possibilities suggest themselves as the reason for the question. The first is that the question was intended to raise the duality of defense counsel's representation. But if that was the reason, it would logically seem that trial counsel would follow up the question with the request that the accused be asked if he desired to retain his lawyer, despite the inconsistent position which the lawyer was then shown to occupy. Surely trial counsel would not raise an issue which he recognized as error without attempting to cure the situation by some positive election by the accused reflected in the record. We are constrained, therefore, to conclude that that was not trial counsel's purpose.

The second tactical possibility is that

60

the question was asked for the specific purpose of having the known answer detract from the accused's case and fortify the prosecution's case. How could that be accomplished? Simply by creating the impression that, because of his previous relationship with defense counsel, the witness gave him favorable answers in his cross-examination. Thus, the court members would be invited to disbelieve the testimony elicited on cross-examination favorable to the accused and credit only the witness' damaging direct testimony. Of course, it may be that trial counsel's motives were not so subtle, and that the question was one of pure chance. That fact, however, would not detract from the very real risk that the court-martial could construe the answer as we have indicated. Here again, therefore, defense counsel's duality of representation could reasonably have harmed the accused.

The Government vigorously contends that a perusal of the record illustrates that defense counsel effec- tively represented the accused and that his trial tactics and strategy were proper and correct. This argument falls short of the mark because the test is not whether counsel could have done *more* by way of further cross-examination or impeachment of his former client, but whether he did *less* as a result of his former participation. We have often said that the interests of justice require that "the appearance of evil should be avoided as well as the evil itself." United States v Hill, 6 USCMA 599, 20 CMR 315; United States v McCluskey, supra; United States v Walters, 4 USCMA 617, 16 CMR 191. It is unnecessary to don "presbyopic spectacles" in this case to find the appearance of evil—it is readily apparent to the naked eye.

Other than the single disclosure by Fields that the defense counsel had previously represented him before a court-martial, the record is silent as to any indication that the accused knew prior to trial of counsel's conflicting interests and that he consented to be represented by this counsel. Paragraph 48c, Manual for Courts-Martial, United States, 1951, in discussing the duties of defense counsel, requires that an accused be informed of any interest his counsel may have "in connection with the case, any ground of possible disqualification, and any other matter which might influence the accused in the selection of counsel." Good practice demands that such disclosures be made a matter of record and brought to the attention of the law officer prior to arraignment so that the latter may assure himself the accused is fully cognizant of the limitations and restrictions placed upon his counsel. With the benefit of this information an accused can make an enlightened election whether to retain appointed counsel or seek a replacement.

We conclude, therefore, that the accused was denied the effective assistance of counsel as a result of defense counsel's prior representation of Fields.

## II

Next, we turn our attention to the second granted issue, which deals with the sufficiency of the evidence to support the finding of value of the pistol allegedly purchased by the accused. The specification charged the accused with having unlawfully purchased a stolen pistol of the value of $53.00, and a court-martial found him guilty as charged. Value becomes an important element in this case because the purchase of stolen property valued in excess of $50.00 permits the imposition of a maximum punishment of confinement at hard labor for three years, whereas if the value is less than $50.00, but more than $20.00, the maximum period of confinement may not exceed one year. Paragraph 127c, Table of Maximum Punishments, Manual for Courts-Martial, supra.

It therefore becomes necessary to examine the evidence adduced at trial to establish this essential element. Fields had testified that while on guard duty he had stolen the pistol from the battalion guardhouse. This theft had occurred some seven months prior to the time the pistol was allegedly sold to the accused. He further testified that at the time of the theft the pistol was "loose" and that most of the bluing

had been rubbed off, and that one of the grips of the handle was missing. The only evidence introduced by the prosecution to establish value was a stipulation that the pistol was listed on an official Army Price List as having a value of $53.00. The defense counsel, on the other hand, had introduced a stipulation that a United States Army .45 caliber pistol is "readily obtainable on the legal civilian market at a price ranging from approximately $20.00 to $45.00." The weapon itself was not introduced into evidence nor was it ever exhibited to the court members.

The Manual for Courts-Martial, supra, provides that items of Government issue "which were serviceable government property at the time they were stolen are deemed to have values equivalent to the prices therefor as listed in official publications." Paragraph 200a (7), Manual for Courts-Martial, supra. We have on several occasions expressly sanctioned the use of official Government price lists to establish the value of Government property and equipment. United States v Leal, 7 USCMA 15, 21 CMR 141; United States v Steward, 6 USCMA 531, 20 CMR 247. In the instant case, however, the record is silent as to any evidence that the pistol was considered to be in "serviceable" condition at the time it was purchased by the accused. Furthermore, no effort was made to establish the amount by which the price list value of the pistol was decreased by the defects which were present when the sale was consummated. Surely it cannot be seriously contended that the pistol in question had the same value as one without the defects described by Fields. It would have been an easy matter to have fixed the precise value of the pistol by the testimony of persons who were expert in that field. Had this been done, appellate tribunals would not be forced to grope blindly in the dark in an effort to determine if there is sufficient evidence to sustain the finding by the court-martial. We find in this case that there was not sufficient evidence to sustain the finding of a value of $53.00.

In view of our holding on the first granted issue, the decision of the board of review is reversed. Although the accused entered a plea of guilty to the offense of carelessly discharging a firearm, we deem it appropriate to set aside the findings of guilty of all charges, together with the sentence, and we so direct. United States v Lovett, supra. A rehearing may be ordered.

Chief Judge QUINN concurs.

LATIMER, Judge (concurring in part and dissenting in part):

I concur in part and dissent in part.

This case is a sequel to United States v Lovett, 7 USCMA 704, 23 CMR 168, decided April 12, 1957, and the fears I therein expressed have been realized all too soon. If Lovett is bad for a holding of infidelity without knowing the true facts, this case is much worse. Here the accused is given a new trial because it is concluded he was denied effective assistance of counsel, and that conclusion is, without doubt, based on the sheerest conjecture and speculation imaginable, for there is not the slightest shred of evidence in the record to support it. There is one statement that trial defense counsel had represented the seller of the weapon at his trial, and appellate defense counsel have affixed a mimeographed copy of a court-martial order to their brief. Therefore, every argument advanced by the Court is predicated on those two bits of evidence and, when they are given full faith and credence, I find they fall far short of supplying any evidence on the critical issue that accused received inadequate representation. While my associates find otherwise, to soften the blow it is suggested by them that the lawyer acted in good faith, but any attorney worth his salt must know he is not true to his trust if, because of prior activities, he is not free to cross-examine every witness appearing against his client. However, I am pleased for the concession of good faith on the part of the lawyer for, as I read the record, he performed his task well and his legal career should not be marred by a suspicion of bad faith, much less with a

holding of having inadequately represented his client.

It is not easy to second guess trial defense counsel when the facts are known, but it is dangerous and sometimes not the better part of wisdom to attempt to do so on imaginary hypotheses. I suppose that, in many instances, appellate judges may find that trial lawyers who lost in the trial court could have done better. My associates believe this lawyer failed to pursue avenues of approach which were open to him and, to support their view, they question his failure to cross-examine. In order to give to the reader a fair opportunity to assess the merits of their argument, I find it necessary to relate a few facts. This accused was charged with unlawfully purchasing a pistol, knowing the same to be stolen. The pistol was purchased on April 2, 1956, from one Horace J. Fields, who had stolen the weapon from a battalion guardhouse several months before the sale. The identity of the thief was not discovered until the weapon was recovered from the car of one Sergeant Edwards, on April 11, 1956. He was in an embarrassing situation trying to explain the presence of the stolen pistol in his car, but he had given the accused a ride the night before and, when he consulted with the accused, the latter admitted leaving the weapon in the automobile. An investigation was then launched, and it resulted in Private Fields being charged with the theft of the pistol and its unlawful sale, and the accused being charged with unlawfully purchasing the weapon. In the course of the investigation, both made pretrial statements and both testified under oath at the pretrial hearing which was subsequently held. In that hearing, they were represented by First Lieutenant Lawrence R. Trapp, not the lawyer presently involved. The hearing was held on April 21, 1956, and this is their sworn testimony as summarized by the officer conducting the hearing. Private Fields states, "That on or about 2 April 1956 he was in Columbus, Ga. with Pvt Nelms and Sp3 Thorton at the Cheerio club and that he sold Thornton a .45 calibre automatic pistol for $20.00. That he had stolen the pistol

from the 6th Battalion guard house several months ago, about September while he was on guard one night. . . . That he told Thornton the pistol was stolen at the time he sold it to him." This testimony is consistent with his earlier pretrial confession. It is to be noted that under oath he confessed to the stealing and the sale; he identified the accused as the purchaser; and he stated he had informed the accused at the time of the sale that the weapon was stolen.

In the same hearing, the accused testified, and this is the officer's summarization of his sworn testimony: "That he met Fields and Nelms at 6th Street and 8th Avenue in Columbus, Ga., on the night of 2 April 1956 and that they went to the Cheerio Club on 4th Avenue. That he had a pint of whiskey with him at the time; that they sat down at a table in the club and that he and Nelms began drinking the whiskey. That Fields was complaining that he couldn't buy anything because he was broke because of having bought an automobile. That Fields showed him a pistol and said that he wanted to sell it. I asked him where he had got it and Fields answered 'don't worry about it, I had it a long time.' That he offered Fields $15.00 for the pistol, but Fields said he wanted $20.00. That he gave Fields a $20.00 bill and Fields handed him the pistol. That Nelms was dancing and messing around most of the time and couldn't have heard everything they said. After I had bought the weapon Fields told me not to take it back to camp or I might get in some trouble. . . . I knew it was an Army pistol but Fields didn't tell me where he got it. He told me that it was stolen but not where from." From this recitation of facts, it is beyond doubt that the accused admitted the purchase of the pistol and the knowledge that it was stolen.

I have always supposed that when counsel are appointed to represent accused persons, they are required to accept the facts as they are known by those who might be called as witnesses, and that it is a hazardous business to have them change their sworn testimony unless they have originally fabri-

cated the evidence. At least I start with that premise, and so the facts concerning the crime were fairly well molded into a fixed pattern before this counsel could advise his clients not to talk, and they pretty well limited his course of action thereafter.

Passing back to the facts which arose later in the proceedings and for the purpose of the dissenting portion of this opinion, I take judicial notice of the contents of a court-martial order attached to the brief. When I do that, I find that on May 16, 1956, Fields pleaded guilty to the theft of the pistol and its sale to the accused. Some thirty days later, the present action commenced, and the Government called him as one of its witnesses. Of course, I should mention that there is no evidence that the plea was negotiated or that Fields was granted immunity. On the contrary, the order shows he was sentenced to three years confinement with appropriate accessories, which was subsequently cut to eighteen months. Furthermore, I should state that other witnesses testified to the sale.

Fortunately for the accused, Fields had been sentenced before he was called to testify, and he turned out to be a very helpful defense witness. As a matter of intense interest, he furnished corroboration for the only possible defense available, for he modified his pretrial testimony considerably in its previous incriminating aspects, as at this hearing he testified the accused did not know the weapon was stolen until after he paid the purchase price. Trial counsel was then faced with the task of weakening Fields' testimony and, in an effort to show he was friendly to the defense, he asked him who represented him in his trial. Fields gave the officer's name, and it was the lawyer who was then representing the accused.

Now I personally believe it was of distinct advantage to the accused to have the lawyer who represented Fields represent him. The favorable testimony given by Fields partially argues that assertion for me, but my good associates take issue and offer these arguments to support their conclusion that the relationship was charged with prejudice. First they say: "Defense counsel made no effort to examine his former client on the question of whether the accused had actually purchased the weapon from him." In answer to that, I suggest it would be most foolish for defending counsel to pursue that line of inquiry unless he hoped to add weight to the Government's showing by having the witness repeat what could not be placed in question. It must be kept in mind that he was confronted with two pretrial statements, two admissions under oath, and a plea of guilty to establish that fact. Again they say: "He never interrogated the witness on the fact of his theft of the pistol or whether it came from a Government source." Perhaps I misunderstand the proper method of conducting cross-examination, but I thought that was an art in which the examiner attempted to help his client by breaking down a witness' story if it was damaging, and not to conduct artless questioning which permitted the witness to repeat testimony which could only help the prosecution. As may be apparent, the only prayer this defense counsel had for a finding of not guilty was founded on a theory that the Government might fail to establish beyond a reasonable doubt that the accused knew the weapon was stolen at the time of his purchase. If defense counsel could sustain that hypothesis, he could win, and the only two witnesses who could help him to satisfy the court-martial in that regard were the accused and Fields. Both were on record under oath, and I have grave doubts that an experienced cross-examiner would try to discredit the only two people who might be helpful by proving they were perjurers.

As I read civilian cases on this subject, I sense that they consider an issue which raises inadequacy of counsel to be in a sensitive area and that on appeal many unsuccessful litigants hurl unfair charges about their attorney. Therefore, I believe that in fairness to defending counsel, before this Court declares them to have been guilty of inadequacy, careful consideration should be given to the problems faced by them at the trial level. Representa-

tion of two persons accused of crimes arising out of one transaction is no evidence of inadequate representation, and the fact that one of the two offenders is used as a witness against the other is no proof that the lawyer did not truly represent both parties. It is quite common for attorneys practicing in the civilian criminal field to well and truly represent joint defendants even when it appears on the surface that the defenses may be inconsistent. Moreover, it is more common for one lawyer to represent both parties to a sale and purchase of stolen property for their defenses may be compatible. This case is a fine example for it is readily apparent that the accused did not have an inconsistent defense with Fields—he was in the fortunate situation that Fields could assume full responsibility and at the same time come to his aid. If I were the accused under similar circumstances, I could ask for no more favorable position. What, then, I ask, is the evidence to support a finding that the accused was denied a fair trial?

Passing from the area of prejudice to the accused, the Court wanders into the fields of tightrope walking and appearance of evil. Those are general observations and, under some circumstances, they might be defensible assertions but, in the background of this record, they are mere diversionary arguments. For the first theory to be persuasive, the position of counsel must be on a rope and not on the Chesapeake Bay Bridge. Here there is nothing to show any reasonable probability that the boundaries between the interests of the accused and retaining the confidence of Fields had narrowed to the thickness of hemp. For aught that is reasonably inferable from this record, they could be poles apart.

As to the appearance of evil theory, I merely say that that principle is predicated upon some sort of concept that an evil is presented by the record which must be stamped out without regard to its prejudicial effect on an accused. Here it is indistinguishable to me. In the case of United States v McCluskey, 6 USCMA 545, 20 CMR 261, from which the Court quotes, the question was whether an attorney who had represented an accused and obtained information could turn around and, while being assigned as trial counsel, use the communications to perfect a case against his own client. There was more than an appearance of evil in that instance and that principle was not invoked as the basis for reversal. Certainly I have no disposition to dispute the proposition that it would be a credit of the legal profession if all attorneys avoided the appearance of evil, but failure to meet ethical matters only affects guilt or innocence or a fair trial in a few instances, and this is not one. Either this accused was specifically prejudiced by having an attorney for his counselor who could not represent him properly or he is not entitled to relief. As I understand the rule followed by appellate courts, the burden is on the accused to show reasonably that his right to effective counsel was impaired. There is no such showing here and well there could not be for the record shows the accused was well and adequately represented.

I concur with the discussion concerning the value of the pistol and I would therefore permit a board of review to reconsider the sentence in the light of the diminished findings.