UNITED STATES, Appellee

v

MICHAEL COATES, Specialist Four,
U. S. Army, Appellant

20 USCMA 132, 42 CMR 324

No. 22,793

November 13, 1970

*Miss Anna R. Lavin* argued the cause for Appellant, Accused. With her on the brief were *Norman Wexler, Esquire,* and *Captain Monte Engler.*

*Captain M. M. O'Dowd, Jr.,* argued the cause for Appellee, United States. With him on the brief were *Colonel David T. Bryant, Major Edwin P. Wasinger, Captain Edward W. Hieronymus,* and *Captain Benjamin G. Porter.*

## Opinion of the Court

QUINN, Chief Judge:

A general court-martial convened in Saigon, Republic of Vietnam, convicted the accused of larceny, in violation of Article 121, Uniform Code of Military Justice, 10 USC § 921. Two questions dealing with corroboration of a pretrial statement by the accused provide the basis for this appeal.

The accused contends there is insufficient independent evidence in the record of trial to corroborate his confession. Since the offense ▆▆▆▆▆▆ ▆ was committed before the Manual for Courts-Martial, United States, 1969 (Revised edition), took effect, the degree of corroboration is that prescribed by the 1951 Manual. United States v Hise, 20 USCMA 3, 42 CMR 195 (1970). Under the 1951 Manual, a confession could not be considered as evidence against the accused "unless there . . . [was] other evidence, either direct or circumstantial, that the offense charged had probably been committed by someone." Manual for Courts-Martial, United States, 1951, paragraph 140a, page 251; United States v Smith, 13 USCMA 105, 32 CMR 105 (1962). This provision was construed to require corroboration for "each element of the offense

charged," except that the accused committed, or participated in, the crime. United States v Young, 12 USCMA 211, 30 CMR 211 (1961); United States v Snearley, 15 USCMA 462, 463, 35 CMR 434 (1965).

In his pretrial confession the accused recounted a scheme entered into with Hung, an English-speaking Vietnamese national, for the theft of cargo unloaded from a ship at a United States Government pier in Saigon. The scheme resulted in the transfer to Hung of eleven pallets of cigarettes, containing over ten thousand cartons, which were consigned to the Vietnam Regional Exchange. For his part in the transaction, the accused received $800.00, and a promise of payment of an additional amount.

Independent evidence indicates that the ship, the Pelican State, docked at Pier K–12, on September 30, 1968. It unloaded cargo until 11:00 p.m., October 15. Included in the unloaded cargo were two hundred thirty-two pallets of cigarettes, all of which were required to be sent to the receiving warehouse of the Vietnam Regional Exchange, known as COFAT S–2, which was located in Cholon, Saigon. Cargo was cleared from the pier area as expeditiously as possible by loading it on trucks for direct delivery to the consignee. Such transshipment was frequently effected within hours of unloading from the ship, but if not so removed, a request for trucks would be submitted for "the following day to clear this cargo from  .  .  .  [the] pier."

Exit from the port area was controlled by checkpoints manned by military police. Drivers of commercial trucks were required to exhibit a Transportation Control Movement Document (TCMD), which authorized possession of the cargo listed on the document. A TCMD was not required for the exit of a military truck, but such vehicles had to have a military escort. The accused was the Documentation Clerk at the pier; one of his duties included issuance of TCMDs.

On Sunday, October 13, Lieutenant Jeffrey R. Mather was the officer in charge at Pier K–12. He had been assigned to the pier during the last week in September and did not know that military trucks could not be used to transport particular cargo such as cigarettes and beer. About 11:00 a.m., the accused informed him that "two military trucks" were at the pier to "pick up" cigarettes or beer. He authorized their loading to "deplete this commodity that was taking up so much space" on the pier. About 1:00 p.m., he was informed by the accused that the trucks had left the pier without the final draft of necessary transportation documents and had been last seen headed toward the exit area known as Checkpoint Alpha, which was about a quarter of a mile from the pier, by the checker who had supervised the loading of cargo on them.

One of the two guards at Checkpoint Alpha testified that, during his tour of duty, between 8:00 a.m. and 4:00 p.m., two "civilian-type trucks painted military" went through the checkpoint. The trucks were driven by "GI drivers," who exhibited TCMDs indicating that the vehicles contained cigarettes and that " 'no military escort [was] required.' " The guard verified the no escort provision by checking with his desk sergeant, and allowed the trucks to pass. Without tracing the basis of the time sequence, it can also be fairly inferred that about this time the checker for post exchange items at the pier telephoned the manager of COFAT S–2 to inquire whether he had received a load of cigarettes on "GI trucks." According to COFAT S–2 records, no such freight was received between 2:55 a.m. and 6:00 p.m. on October 13. The records were based upon an individual count of each item as it was unloaded at the warehouse. It further appeared that twenty-three pallets of cigarettes were received from the Pelican State between 12:05 a.m. and 2:55 a.m., and eight pallets of cigarettes were received from the Pelican State at 6:00 p.m.

134

In United States v Leal, 7 USCMA 15, 21 CMR 141 (1956), we held that a material shortage in an inventory of items subject to close custody provides reasonable support for a conclusion that at least part of the shortage probably resulted from theft. Here, two hundred thirty-two pallets of cigarettes were unloaded on the pier and only two hundred eight were delivered to COFAT S-2, the only place to which they could be delivered if they left the pier. There is no direct testimony to indicate that all the pallets unloaded from the Pelican State were, in fact, removed from the pier area. As a result, appellate defense counsel contend there is no evidence that a shortage existed. The absence of direct proof of a probable shortage is, however, not determinative of the matter. The necessary corroborative evidence may be circumstantial in nature. United States v Young, supra, page 213; United States v Snearley, supra, page 463.

It is manifest from Lieutenant Mather's testimony that the area for unloaded cargo at Pier K-12 was limited. His testimony further indicates that it was the practice to clear unloaded cargo from the pier area as rapidly as possible by reloading on trucks for delivery to the consignee. If trucks were not immediately available, they were, as noted, requested the "following day." COFAT S-2 received no cigarettes from the Pelican State after October 14. It may, therefore, be fairly inferred from the pier practice that no cigarette pallets taken from that ship remained at the pier after the Pelican State completed unloading on October 15. In light of the security measure for safeguarding the movement of cargo from the pier area, the almost inescapable conclusion is that the difference between the number of pallets unloaded and the number of pallets received at COFAT S-2 was at least in part due to the incident involving the two trucks that passed through Checkpoint Alpha on October 13.

The accused's statements to Lieutenant Mather were contemporaneous with the alleged offense and were, therefore, admissible as independent corroborative evidence. United States v Villasenor, 6 USCMA 3, 11, 19 CMR 129 (1955); United States v Snearley, supra, page 465. These statements indicated that about 11:00 a.m., two trucks driven by GI drivers had come to the pier to be loaded with cigarettes or beer; these trucks were loaded, and were last seen going toward exit Checkpoint Alpha. Two trucks driven by GI drivers, whose TCMDs indicated that their cargoes were cigarettes which could only be consigned to COFAT S-2, passed through Checkpoint Alpha sometime before 4:00 p.m. Considering the short distance between the pier and the checkpoint, it may be fairly inferred that the two trucks were the same as those referred to by the accused. No cigarettes were received at COFAT S-2 between 2:55 a.m. and 6:00 p.m. The delivery at 6:00 p.m. was made by a single truck. The five-hour interval between the time the two trucks passed Checkpoint Alpha and the 6:00 p.m. delivery to COFAT S-2 strongly indicates that neither of the trucks were involved in the delivery. However, even if that inference is not drawn, the evidence demonstrates that one of the two trucks did not deliver its cargo to COFAT S-2, as required. The circumstantial evidence, therefore, establishes with reasonable probability, that the difference between the number of cigarettes unloaded from the Pelican State and the number of cigarettes delivered to COFAT S-2 was due, at least in part, to theft. We conclude, therefore, that the independent evidence as to the probable existence of every element of the offense, other than that of the identity of the wrongdoer, is sufficient to corroborate the accused's pretrial statement admitting his participation in the larceny. United States v Fioco, 10 USCMA 198, 27 CMR 272 (1959); United States v Leal, supra.

A second assignment of error challenges the sufficiency of the instruc-

tions as to corroboration that were given the court members. Implicit in the accused's argument is an assumption that the court members must be instructed as to the necessity for corroboration of the confession by independent evidence of the elements of the offense. There is substantial authority to the effect that the question of corroboration is one of law for the judge, not one of fact for determination by the court members. Iva Ikuko Toguri D'Aquino v United States, 192 F2d 338 (CA9th Cir) (1951), certiorari denied, 343 US 935, 96 L Ed 1343, 72 S Ct 772 (1952); United States v Winborn, 14 USCMA 277, 34 CMR 57 (1963), opinion by Chief Judge Quinn; United States v Landrum, 4 USCMA 707, 16 CMR 281 (1954), opinion by Judge Brosman; United States v Mallett, 22 CMR 572 (ABR 1956). However, there is also authority to indicate that the triers of the facts should receive instructions regarding the requirement of corroboration. See Felton v United States, 344 F2d 111 (CA 10th Cir) (1965); People v Clark, 117 Cal App 2d 134, 255 P2d 79 (1953). Corpus Juris Secundum reflects this dichotomy of approach in its discussion of the question, as follows:

"The court should properly instruct as to the law governing, or requiring, corroboration of an extrajudicial confession or admission, but a failure to *do so is not error where the confession is amply corroborated.* Where a confession need be corroborated only as to the corpus delicti to support a conviction, and the corpus delicti has been clearly proved, *it is not necessary to instruct that an extrajudicial confession or admission will not justify a conviction unless accompanied by proof of the corpus delicti;* but, where it is doubtful whether a crime has been committed at all, the jury should be so instructed. Such instruction, however, need not, in addition to requiring proof of the corpus delicti, require proof connecting accused with the commission of the offense." [Emphasis supplied.] [23A CJS, Criminal Law, section 1231.]

We need not decide the matter. United States v Allums, 5 USCMA 435, 18 CMR 59 (1955). As we noted earlier, the extent of corroboration in this case is determinable by the standard prescribed in the 1951 Manual, that is, that the independent evidence must corroborate every essential element of the offense, except the identity of the wrondoer. The law officer instructed the court members on the elements of the offense. Immediately thereafter, he referred to the accused's pretrial statement and instructed upon two "aspects" that the court members had to determine; the first aspect dealt with the voluntariness of the pretrial statement, and the second concerned corroboration. The instructions as to the latter were as follows:

"That exhibit cannot be considered as evidence against the accused on the question of his guilt or innocence unless some independent evidence, either direct or circumstantial, has been introduced which corroborates the essential facts admitted in Prosecution Exhibit 3 sufficiently to justify an inference of their truth. This independent evidence need not identify the accused as a perpetrator of crime or participant in the criminal scheme, and the independent evidence need not extend to the details of the manner specifically in which a crime may have been committed. It need only raise an inference of truth of the essential facts admitted in Prosecution Exhibit 3."

Considering the instructions on the elements of the offense with those on corroboration, as the natural progression of the instructions dictate, the "essential facts" referred to in the corroboration instructions can only be understood to mean those facts which would establish the offense charged. Appellate defense counsel recognize the relationship, but they contend the court members could have mistakenly concluded that corroboration of only one essential fact or element would be sufficient to justify consideration of the accused's statement. Two parts of

the instructions make that construction so unlikely as to require us to reject it as a reasonable possibility. First, the court members were expressly advised that they must find corroboration of the essential *facts*, not single but multiple. Secondly, the instructions enumerated two particular facts that were not essential to corroboration, namely, that the accused was the "perpetrator" of, or a "participant" in, the crime and the "details of the manner" in which the crime was committed. Necessarily implied from the specific exclusions is that independent evidence of all other essential facts had to be found before the pretrial statement could be considered as evidence. We conclude, therefore, that if instructions on corroboration are proper, those given the court members were sufficient to present the issue in terms of the standard prescribed by the 1951 Manual.

The decision of the United States Army Court of Military Review is affirmed.

Judges FERGUSON and DARDEN concur.